# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JACOBBI J. WILSON, | ) | 1:08cv01933 GSA |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S SOCIAL |
| v. | ) | SECURITY COMPLAINT |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## BACKGROUND

Plaintiff Jacobbi J. Wilson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for child's supplemental security income, pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

//
//
//
//

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (*See* Docs. 9 & 10.)

1

1 **FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed his application on April 7, 2006. AR 108-113.[3] After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 74-79, 81-86. A hearing was held on January 8, 2008. AR 25-629. The ALJ issued a decision denying benefits on March 27, 2008. AR 7-21. On October 13, 2008, the Appeals Council denied review. AR 2-4.

Hearing Testimony

ALJ Michael J. Haubner held a hearing on January 8, 2008, in Fresno, California. Plaintiff appeared and testified, and was represented by counsel. Additionally, Willie Wilson testified as a witness. AR 25-62.

Plaintiff testified that his date of birth was October 20, 1989, making him eighteen years old at the time of the hearing. AR 27. He lives in Fresno with his parents. Two younger siblings, his older brother and his girlfriend, and their baby, also live in the home. AR 36-37. His mother works full-time and his father is disabled. AR 34. Plaintiff has his own room at home and makes his own bed every day and changes the sheets once a week. He has regular chores that include cleaning the bathroom and living room, taking out the trash, and doing the dishes. AR 36. He does not do laundry. AR 39.

Plaintiff had not yet graduated from high school but is in his senior year. He did not know his grade point average. AR 31. He has flunked certain courses in the previous two years, but has not had to repeat an entire year of education. AR 32. He is currently receiving special education classes ("IEP") and tutoring. AR 32-33. Plaintiff is a running back on Sunnyside High School's football team. AR 33. As a freshman, Plaintiff was suspended for one week for fighting. AR 33-34.

About once a month, Plaintiff will babysit his brother's one year old daughter. Two hours in the longest period of time he has spent babysitting. AR 37. Besides playing football, he

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[3] Plaintiff reached the age of majority on October 20, 2007.

2

enjoys watching television. He estimates he watches television about three hours a day. AR 37. While there is a computer in the home, he does not use it. AR 37-38. He also plays video games for about thirty minutes every day. AR 38.

While he does not have a driver's license and never has, Plaintiff admitted driving "every couple weeks" on average. AR 34-35. When he does drive, he drives a car with an automatic transmission; he has been driving since the age of fourteen. AR 35. He has a cell phone and talks on the phone every day. AR 39.

Plaintiff has never had a job, nor has he applied for one. AR 35. He gets homework every day and spends about a half an hour on it. Football practice lasts two hours. AR 38. He is able to take care of his own personal grooming needs. AR 38. He does not cook meals, but can make a sandwich or use the microwave. AR 39.

For his asthma condition, Plaintiff uses an inhaler. He does not take any medication for the condition in either pill or syrup form, and does not use a nebulizer. He has been treated in the emergency room for breathing problems, but had not stayed overnight. AR 40. Plaintiff agreed that his problems include back problems, asthma, learning disabilities, ADHD and borderline intellectual functioning. AR 41.

When asked how much weight he was capable of lifting and carrying, he estimated he could lift and carry 100 pounds. He could stand for fifteen minutes at one time, sit for fifteen to twenty minutes at one time, and walk for about an hour before needing to rest. AR 41. Plaintiff estimated he could pay attention and concentrate for about ten to fifteen minutes at a time, after which he would rest his mind for about twenty minutes before being able to focus once again. AR 42.

With regard to the tutoring he receives, Plaintiff indicated it is primarily in the subject of English. He can read and write; he does not know his current reading level because no one has told him. He can read a newspaper headline and the sports page. AR 43. His learning disability involves forgetting instructions given by the teacher after five or ten minutes. He can read instructions in writing, but cannot follow them on his own. He has to ask his teachers for an explanation more than once, typically this occurs in math and science classes. AR 44.

Economics can also cause him difficulty, but he does not receive tutoring in that subject. AR 45. His older brother will assist him with his homework. AR 45. He is patient and explains the lesson word by word "like the teacher doesn't." AR 46. While his older brother may have to explain an economics lesson more than once, Plaintiff is able to complete his assignment. AR 46. He does not know what grade he is earning in economics because the class has just started. AR 46.

With specific regard to his asthma condition, Plaintiff testified that it is triggered by others smoking around him and extreme heat. He has an asthma attack about three times a year. He indicated the inhaler will "[s]ometimes" control an asthma attack. AR 47. Plaintiff is not treated by a psychiatrist or counselor for ADHD. AR 48.

When questioned by his attorney, Plaintiff admitted that he was no longer playing on the football team because he was "kicked off" in the seventh week of the season for cursing a teacher. Apparently his math teacher said something he did not agree with, so he "just went off on her." AR 48. He has applied for admission to Fresno City College because he hopes to play football there. He spoke with the coach in December and was told the coach was very interested because they needed a good, short, fast running back. At the time of the hearing, Plaintiff did not yet know whether he had been accepted to junior college. AR 49-50.

In addition to the incident involving his math teacher, Plaintiff indicated he was involved in a fight with another student while playing basketball. The other student hit him in the head with the basketball and started laughing. Plaintiff "just got mad and hit him." AR 49. There have been previous instances where he becomes angry with others and cannot stop himself from fighting. He explained it is as if he goes "blank" and his "frustration takes over." AR 50. This is a problem at home as well and happens almost every day. Asked to give an example, Plaintiff indicated that in November he and his dad "got into it" and he tried to fight his dad, but his dad walked away. Plaintiff spend that night at his grandma's house. AR 50.

Plaintiff's father, Willie Wilson, testified that his son is in special education classes because he "has a learning disability because he ha[s] never gotten good grades." AR 52. Mr. Wilson indicated that when he assigns Plaintiff chores at home he cannot follow directions, he

1 "either won't do it or he won't like it."  AR 52.  Mr. Wilson testified that Plaintiff was different from other teenagers because he would "explode and get angry and cuss you out."  AR 52.  This behavior will occur about once a month.  Plaintiff will leave the house and return after cooling off for three to four hours.  When he returns, it's like nothing ever happened.  There is nothing in particular that triggers the episodes.  AR 53.  Mr. Wilson indicated he has not taken Plaintiff for any kind of psychological or psychiatric counseling or treatment.  AR 53.   Neither has Plaintiff received that type of treatment through the school, nor taken medication related to that condition.  AR 54.

According to Mr. Wilson, Plaintiff last suffered from an asthma attack the previous fall.  Occasionally Plaintiff suffers from nose bleeds while he sleeps.  He has suffered from nose bleeds since he "was little" rather than only during the period he has played football.  AR 54-55.

With regard to Plaintiff's learning disability, Mr. Wilson questioned findings that the disability only affected two subjects because Plaintiff was getting F's in all his classes.  AR 55.  Asked for examples regarding Plaintiff's learning difficulties, Mr. Wilson indicated when the family goes bowling, Plaintiff becomes frustrated because he cannot keep score.  While the machines also keep score, Mr. Wilson testified a person still has to be able to keep score.  Plaintiff becomes frustrated and gets mad when the other kids tease him.  AR 56.  Plaintiff also has difficulty accepting and following directions, and has since he was young.  AR 56-57.

Plaintiff's coaches have indicated that he cannot remember the plays, and that is one reason he did not play as much as he should have last year.  AR 57.  Mr. Wilson believes Plaintiff should receive more help than what he is getting, and that Plaintiff needs help with his "real bad anger problem."  AR 57.

Mr. Wilson indicated that Plaintiff does not do yard work around the house.  AR 57.  He takes out the trash once a week and drives down the street about once a week.  AR 58.  Plaintiff does not make his own bed, but he does change the sheets once a week.  AR 58.  He cleans the bathroom and kitchen once a week.  AR 58.  He washes dishes once a week.  AR 60.  He also babysits his niece about once a month for an hour or two.  AR 58-59.  While Plaintiff does play video games, he does not do so every day and Mr. Wilson estimated it was about once a month.

When asked about Plaintiff's completion of his homework, Mr. Wilson indicated Plaintiff does not do his homework every day. AR 59. Instead, he does it "once or twice a month." AR 60. Plaintiff can cook a simple meal like eggs when he's hungry, and Mr. Wilson indicated he will prepare simple meals just about every day. AR 60. Lastly, Mr. Wilson indicated that his son talks on the phone every day. AR 60.

According to Mr. Wilson, he does not understand his son when he is speaking to him because they are on "two different levels," but he did admit part of that could be that his son is a teenager. AR 61.

Educational Record

The entire record was revealed in this regard, however, only the most relevant reports are included in the Court's summary below.

A psychological and guidance report completed in 1997 by School Psychologist Michelle De La Torre included a twenty-five minute observation wherein it was witnessed Plaintiff was on task ninety-five percent of the time, attempted to solve problems using his fingers to count and did not talk or interact with other students. He was cooperative and well behaved and remained on task during testing. It was recommended he be referred for psychoeducation evaluation due to concerns about slow academic progress. His ability was in the below average range and a severe discrepancy was noted between his estimated ability and achievement in assessed areas. At the time, he did not qualify for academic special education, but due to weakness should continue in the "'Reading Recovery'" program. AR 292-296.

A Speech Language Evaluation dated May 15, 2003, revealed slightly delayed language skills, no discrepancy between expressive and receptive language skills, and normal articulation, voice and fluency skills. Gaylene Thomas, M.A., speech and language specialist, found Plaintiff did not meet the qualification guidelines for speech and language services within the Fresno Unified School District, and recommended he be dismissed from speech therapy. AR 273-274.

A January 5, 2006, Multidisciplinary Psychoeducational Report included the following findings. Plaintiff's reading skills were below average for comprehension. His writing skills were average overall, but slightly below average in sentence construction and expression. His

math skills were poor and math calculation and reasoning were borderline. His language skills were on the lower side of average and he appeared to be "decent at listening" and understanding oral presentations. AR 134. It was noted he was willing and ready to work and performed without exhibiting frustration during the testing. AR 135. His general memory skills were average, as were his verbal memory skills. His visual memory skills were below average as were the scores related to attention and concentration. AR 136. His adaptive behavior evaluation was average overall. Low average scores were recorded in the communication skills subscale and a low score on the functional academics subscale and work subscale were also recorded. AR 138. The report included an ADD evaluation scale used in the home. Willie Wilson's report indicates that Plaintiff does not appear to display excessive symptoms of ADHD at home. AR 139. Plaintiff's phonological awareness skills were poor, his phonological memory skills were below average and his rapid naming skills were average. A significant discrepancy was noted in the area of auditory processing compared to his intellectual ability score. AR 141. It was observed that Plaintiff demonstrated a severe discrepancy between intellectual ability and achievement in the areas of mathematics calculation and reasoning and visual processing. The recommendations included Plaintiff's participation in an after school tutorial program to assist with homework, possible extra time afforded in order to complete math assignments or testing, and the development of goals and objectives. AR 143-144; *see also* AR 206-219.

In a March 20, 2006, email, one of Plaintiff's instructors reported he was polite and able to explain how to complete a problem correctly, but was unable to perform the calculation correctly on his own. His basic algebra skills were weak. AR 118.

A Fresno Unified School District Individualized Education Program form of that same date reveals plaintiff's parents received multidisciplinary and psychoeducational reports. AR 120. Plaintiff had earned 85 credits and was passing English, history and his tutorial classes. However, he was failing all math classes and biology. He communicated clearly and listened to instructions and his self-help skills were appropriate. Motor skills and social/emotional skills were age appropriate, and his health was normal other than his need to wear corrective lenses. A total of forty-eight classes had been missed and thirty tardies were reported. AR 121. Short term

goals included improving math skills and reading comprehension. At the time of assessment, Plaintiff could perform math calculations at a sixty percent accuracy with the aid of a calculator, and could read at a fifth grade level with an eighty percent accuracy in comprehension. AR 122. Specific learning disabilities were identified in math reasoning and calculation, and visual processing. Plaintiff was permitted the use of a calculator for all math tasks, including exams, and teachers were to ensure he understood lessons and provided opportunities for visual tracking and recognition. AR 123. Plaintiff's long range goals included a career as a sports announcer and college education. AR 125.

A health evaluation completed for the Fresno Unified School District by Registered Nurse Kate Brown noted five suspensions for fighting and aggressive behavior, a history of asthma and the need for Plaintiff to wear glasses in the classroom to correct his vision. He was serious and cooperative, followed directions well and asked appropriate questions. His hygiene and gait were normal. AR 132.

A May 8, 2006, Teacher Questionnaire completed by John Nichols noted slight or obvious problems in the area of acquiring and using information (AR 165), a range of no problem to obvious problem in the area of attending and completing tasks (AR 166), no problems in the area of interacting and relating with others (AR 167) or moving about and manipulating objects (AR 168), no problem or slight problem in the area of caring for himself (AR 169), and asthma and allergies that are treated by medication, including Albuterol. AR 170.

A November 10, 2007, Teacher Questionnaire completed by John De La Cerda indicated a mild problem regarding the ability to finish projects, ability to listen and remain attentive, and to concentrate on schoolwork. No problems were recorded in the areas of ability to organize and to play. AR 187. A mild problem was reported regarding Plaintiff's ability to learn new skills and keep up with peers, but no problems were recorded in the areas of ability to stay seated or still, and ability to think before acting or acknowledge own mistake. Further, it was noted Plaintiff's parents were very supportive and he had no visual or hearing problems. AR 188. All areas regarding speech and hand/eye coordination were normal. AR 189. Plaintiff participated in group situations and got along with other children, was not verbally or physically aggressive

toward his peers, and had no difficulty expressing thoughts or feelings. He was cooperative, polite and willing to converse with adults. He attended special education classes regarding learning strategies. AR 190. He took care of his own needs, did not require special attention and played football. AR 191.

A grade report dated 2007 reflects an average grade point of 2.0 or less with regard to the ninth, tenth and eleventh grades with the exception of what appears to be a summer session in the eleventh grade wherein Plaintiff earned a 3.3 grade point average. AR 194.

An IEP form regarding accommodations and modifications dated February 1, 2007, indicates Plaintiff could use calculators and multiplication charts, was permitted more time for testing in an individual or small group setting, and that directions could be read aloud to the student and/or repeated. AR 252.

Medical Record

*Community Medical Center*

On November 6, 1999, Plaintiff was seen in the emergency room for a shortness or breath with a cough and burning sensation in the chest. The working diagnosis noted exacerbation of asthma and allergic rhinitis. Medications and treatment were administered, and he was released. AR 328-332.

On January 14, 2004, Plaintiff was seen in the emergency room for smoke inhalation after food was left burning on the stove. He was wheezing and reported chest pain. He was counseled and diagnosed with mild carbon monoxide poisoning and sent home. AR 203-205.

On March 14, 2004, Plaintiff was again seen in the emergency room for possible smoke inhalation due to burning food on the stove. He complained his chest was burning. He was not in respiratory distress, and was treated and released. AR 320-327.

Plaintiff was seen for an ankle injury while playing football on November 14, 2004. X-rays were negative, a sprain was diagnosed and he was provided crutches. AR 201-202, 312-318.

On September 29, 2006, Plaintiff was treated in the emergency room for rib pain following a tackle during a football game. Lung sounds were good and x-rays were negative but a

clinical impression included a diagnosis of rib fracture. Pain medication was administered and he was discharged. AR 333-344.

*Internal Medicine Evaluation*

In an August 2, 2006, report, board eligible internal medicine physician Rustom F. Damania, M.D., indicated Plaintiff reported chronic low back pain since the age of thirteen. The pain is consistent and present daily, but is sometimes "on and off." A learning disability was noted, as was his attendance in special education classes. He was accompanied by his mother who apparently reported Plaintiff was forgetful and unable to multi-task. Plaintiff reported bronchial asthma since the age of nine without hospitalization, yet with emergency room treatment on a yearly basis. He used an Albuterol and Azmacort inhaler, but did not require steroid, a nebulizer or oxygen. AR 220.

Plaintiff lives with his parents and does not work. He denied the use of tobacco, alcohol or illicit drugs. There was no history of any weight loss or fatigue, vision or hearing problem, nor was there a history of any problem relating to the cardiac, gastrointestinal, genitourinary, hematologic, skin, or neurological systems. AR 221.

Dr. Damania's physical examination showed a well-nourished, well developed young male in no distress. Plaintiff was alert, cooperative and well-oriented. He was sixty-seven inches tall and weighed 156 pounds. Range of motion in the neck was within normal limits, head/ears/nose and throat were normal, lung sounds were symmetric and expiration was normal, heart tones were good, there was no tenderness in the chest and the abdomen was soft and non-tender. AR 222. An examination of the back revealed no tenderness to palpitation in the midline or paraspinal areas, straight leg raising was negative at ninety degrees, no muscle spasm was present and tone was equal throughout. Range of motion was within normal limits. AR 223. All upper and lower extremities showed range of motion within normal limits, hand grip was normal and finger approximation was intact, and no crepitus or patellar instability was noted in the knees. AR 223-224. Pulses were normal, motor strength was 5/5, reflexes were normal and gait was within normal limits. AR 224.

Dr. Damania's diagnostic impression included learning disability, bronchial asthma and low back pain. He found Plaintiff was capable of lifting and carrying fifty pounds occasionally and twenty-five pounds frequently. No postural, visual or manipulative limitations were identified. AR 224-225.

*Psychological Evaluation*

A September 18, 2006, report prepared by William A. Spindell, Ph.D., FACFE, FABMP, included the administration of the Bender Gestalt II, Wechsler Adult Intelligence Scale III and Vineland Adaptive Behavior Scale tests. AR 226.

Plaintiff was sixteen years and ten months old, and was accompanied by his mother. He was attending Sunnyside High School and was in the eleventh grade. His mother reported Plaintiff weighed six pounds, eleven ounces at birth, walked at about one year and had an otherwise typical childhood. He is the second oldest of four children. Plaintiff denied smoking or drinking. AR 226.

Dr. Spindell's direct examination results note a well groomed, neatly dressed individual with a well developed vocabulary. Plaintiff was fully oriented and cooperative throughout. His remote and recent memory functions were within normal limits and he did not exhibit any pressured speech, neologisms, or expressive or receptive problem that would suggest a psychiatric disorder. AR 227. The Bender Visual Motor Gestalt II results with normal with no evidence of angulation, rotation, perserveration or fragmentation. The global score was a 38 and was not associated with a neurological impaired profile. A verbal IQ of 79, performance IQ of 77 and full scale IQ of 76 were recorded. The doctor's diagnostic impression was borderline intellectual functioning. AR 227. Dr. Spindell concluded plaintiff could "address the labor market at this point and from a behavioral trajectory point of view, could probably address several aspects of entry and intermediate activities." AR 227. Plaintiff got along well with others, did not need assistance with the activities of daily living, and could handle his own funds if eligible. AR 227. With regard to work capacity, the doctor indicated Plaintiff was capable of maintaining regular attendance, performing consistently without special attention or additional supervision, could complete a normal workday or workweek, accept instructions from a

supervisor, interact with coworkers and the public and with typical stresses. He could not perform detailed or complex tasks. AR 228. He had the ability to perform the activities of daily living, maintain social relationships, sustain concentration, persistence and pace, and function outside highly supportive arrangements, and was not limited by an episode of decompensation. AR 228; *see also* AR 229-230.

*Function and Disability Reports*

A function report prepared by Plaintiff's father on April 7, 2006, indicates Plaintiff used glasses to correct vision, and did not suffer from problems in hearing, speech, or daily activities. AR 145-147. With regard to communication, it was reported Plaintiff could answer and make telephone calls, but did not deliver phones messages; could repeat stories but not tell jokes or riddles accurately. He was able to explain why he did something, talk with family and friends and ask for what he needs. AR 148. Mr. Wilson indicated however that Plaintiff was unable to understand, carry out and remember simple instructions. AR 149. It was noted that Plaintiff did not drive a car. AR 149. While he generally got along with his parents and other adults, including teachers, and played team sports, Plaintiff did not have friends his own age or make new friends, nor did he get along with his brothers and sisters. It was noted that Plaintiff's friends are typically younger than he is, and that he gets involved in physical and verbal fights with his brother and sisters. AR 150. Regarding Plaintiff's ability care for his personal needs, Mr. Wilson indicated Plaintiff could take care of personal hygiene matters, help around the house, get to school on time, take medication and avoid accidents. However, Plaintiff could not wash and put away his clothes, cook a meal, study and do homework, use public transportation, accept criticism, keep out of trouble, obey rules or ask for help when needed. Mr. Wilson explained Plaintiff is an angry child with a bad temper. AR 151. He cannot complete homework or chores, but can pay attention and work on arts and crafts, keep busy on his own, and finish things he starts. AR 152.

Consultant Richard Betcher, M.D., prepared a Childhood Disability Evaluation Form on October 31, 2006, following a review of the records. He noted Plaintiff's impairments of asthma and learning disabilities. The doctor found the impairments were severe but did not meet or

equal the listings. AR 234-235. With regard to acquiring and using information, attending and completing tasks, interacting with others and caring for himself, and health and physical well being, Dr. Betcher found Plaintiff's limitations to be less than marked. He noted no limitation with regard to moving about or manipulating objects. AR 236-237. Additional consultant M. C. Vea concurred with Dr. Betcher's evaluation on November 1, 2006. AR 235.

A second Childhood Disability Evaluation Form was completed by L. T. Luu, M.D., on January 29, 2007. With regard to Plaintiff's impairment of borderline intellectual functioning, Dr. Luu reported the impairment to be severe but noted it did not meet or equal a listing impairment. AR 241. Less than marked limitations were noted in the areas of acquiring and using information, and attending and completing tasks. No limitations were identified in the areas of interacting and relating with others, moving about and manipulating objects, caring for self, and health and physical well being. AR 243.

In an undated Child Disability report, Mr. Wilson reported Plaintiff's disabilities were related to learning, and asthma. Plaintiff became disabled on October 20, 1994, but his disabilities do not cause pain. He has not been treating for emotional or mental problems. AR 158. He uses an asthma inhaler for asthma related symptoms. AR 159. At the time of the report, Plaintiff was in tenth grade at Sunnyside High School and was in special education classes. AR 161.

An undated and unsigned Disability Report completed by Plaintiff himself references no new illnesses or injuries, continued use of Albuterol and a steroid inhaler that cause fatigue, the ability to care for his own needs with reminders, and the fact he was not employed. AR 178-186.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

**Child Disability Standard**

The childhood disability standard was changed by the Personal Responsibility and Work Opportunity Act of 1996. *Pub. L. No. 104-193, § 211, 110 Stat. 2105 (1996)*, amending 42 U.S.C. § 1382c(a)(3)(A*)*. The amendment provides:

> [A]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked or severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(I).

To apply the new statutory standard, the Commissioner now uses a three-step sequential evaluation procedure for determining whether a child's impairments result in marked and severe functional limitations and is therefore disabled. 20 C.F.R. § 416.924(b)-(d) (2001). The amendment eliminated the fourth step in the disability analysis: determining whether the child had an impairment or impairments of comparable severity to that which would disable an adult. This new standard applies to new claims filed on or after August 22, 1996, and to new claims not yet finally adjudicated on that date. 42 U.S.C. § 1382c. A claim is not finally adjudicated if an administrative or judicial appeal was pending on or after that date regarding a claim that has been denied in whole. *Id.; see Jamerson v. Chater*, 112 F.3d 1064, 1065 n.1 (9th Cir. 1997).

The relevant inquiry at step one is whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If not, step two requires the fact finder to determine whether the child has a medically severe impairment or combination of impairments. 20 C.F.R. § 416.924(c). Plaintiff bears the burden of demonstrating a severe impairment. 20 C.F.R. § 416.924. If the impairment is a "slight abnormality or a combination of slight abnormalities that cause no more than a minimal functional limitation," the Commissioner will find that the child does not have a severe impairment and therefore is not disabled. 20 C.F.R. § 416.924(c).

Step three requires determining whether the severe impairment meets or equals in severity any impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d). If such an impairment exists, the Commissioner must find the child disabled. *Id.* If the child's impairment does not meet or medically equal any listing, then the Commissioner must determine if the limitations caused by the impairment functionally equal a listing in the Listing of Impairments. *Id.* To do so, the Commissioner will assess all of the functional limitations caused by the child's impairments in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well being. *See* 20 C.F.R. § 416.926a(a)-(b). To functionally equal a listing, the impairments must result in marked limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

Where the final decision of the Commissioner was proper under the old standard, it must be upheld under the new standard, as the new standard is more stringent. *Jamerson v. Chater*, 112 F.3d at 1068.

**Adult Disability Standard**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).

In this case, the ALJ found Plaintiff (1) was a minor at the time of application and attained majority on October 20, 2007; (2) has never engaged in substantial gainful activity; (3) has the severe impairments of borderline intellectual functioning, a history of ADHD and a history of a learning disorder; but (4) the impairments do not meet or medically equal any of the listed impairments. Thus, the ALJ found Plaintiff was not under a disability as defined in the Social Security Act. Further, the ALJ determined that despite having no past relevant work, as an adult, Plaintiff has the residual functional capacity ("RFC") to perform simple repetitive tasks without exertional limitation. AR 10-21.

Plaintiff contends the ALJ committed reversible error at step three of the child's sequential disability analysis, and thus, this Court should reverse and remand for the payment of benefits. (Doc. 13 at 3.)

## DISCUSSION

### A. *Step Three of the Child Disability Analysis*

Plaintiff asserts the ALJ did not properly conduct the required analysis for child disability. He argues in order to functionally equal a listed impairment, his severe impairments must result in marked limitations in two domains of functioning or an extreme limitation in one domain. Further, Plaintiff asserts that because his performance on the Wechsler intelligence test found an extreme limitation in the domain of acquiring and using information, he is entitled to benefits. Further, he argues the ALJ never mentioned the Wechsler test scores and thus did not sufficiently explain why he chose not to rely upon the scores, resulting in legal error. (Doc. 13 at 7-11.) The Commissioner replies that the ALJ considered all medical evidence and correctly determined his finding of less than marked limitations in acquiring and using information,

attending and completing tasks, and interacting and relating to others. More specifically, the Commissioner asserts the ALJ's finding of less than marked limitation, notwithstanding the Wechsler scores, is proper because the ALJ relied upon the substantial evidence provided by Drs. Betcher, Vea and Luu. (Doc. 17 at 7-10.)

Step three of the sequential analysis requires determining whether the severe impairment meets or equals in severity any impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d). If such an impairment exists, the Commissioner must find the child disabled. *Id.* If the disease or impairments does not meet or medically equal any listing, the Commissioner must decide whether it functionally equals a listing. 20 C.F.R. § 416.926a(a). Functional equivalence to a listing is established where plaintiff has an "extreme" limitation in one domain of functioning, or "marked" limitations in two or more of the domains of functioning. 20 C.F.R. § 416.926a(a). The domains used are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for one's self; and health and physical well being. 20 C.F.R. § 416.926a(b). A "marked" limitation is one that interferes seriously with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e). "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." *Id*.

ALJ Haubner found, in pertinent part:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce only some of the alleged symptoms, and that the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely credible . . . .
> On two occasions, the State agency medical consultants concluded that in the six domains discussed below, the claimant has less than marked limitation in the first and second domains, no limitations in the fourth, and none-to-less than marked limitation in the third, fifth and sixth domains. I agree with these assessments.
> Consultative psychologist Dr. Spindell, who examined the claimant when he was 16 years, 10 months old, noted that the claimant intended to attend college. Obtained IQ scores were Verbal 79, Performance 77 and Full Scale 76, which produced a diagnosis of borderline intellectual functions. Dr. Spindell noted that the claimant was articulate, motivated and apparently doing reasonably well in his Special Education classes and concluded that the claimant could "address the labor market at this point and from a behavior trajectory point of view, could probably address several aspects of entry and intermediate activities." The claimant was independent with his activities of daily living, got along with his

|   |   |
|---|---|
| 1 | family, and could hand[le] money.  The only limitation Dr. Spindell noted was that the claimant would not be able to perform detailed and complex tasks. |
| 2 | In terms of the six domains of function, I find the following regarding limitations caused by the claimant's impairments: |
| 3 | **a. Acquiring and Using Information** |
|   | This domain considers how well a child is able to acquire or learn |
| 4 | information, and how well a child uses the information he has learned. |
|   | The regulations provide that an adolescent . . . without an impairment should |
| 5 | continue to demonstrate in middle and high school what he has learned in academic assignments . . ..  The child should also be able to use what he has learned in daily living |
| 6 | situations without assistance (e.g., going to the store, using the library, and using public transportation).  The child should be able to comprehend and express both simple and |
| 7 | complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). |
| 8 | The child should also learn to apply these skills in practical ways that will help him enter the workplace after finishing school (e.g., carrying out instructions, preparing a job |
| 9 | application, or being interviewed by a potential employer). |
|   | Social Security regulation 20 CFR 416.926a(g)(3) sets forth some |
| 10 | examples of limited functioning in this domain that children of different ages might have.  The examples do not apply to a child of a particular age; rather, they |
| 11 | cover a range of ages and developmental periods.  In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain.  Some |
| 12 | examples of difficulty children could have in acquiring and using information area: (I) does not understand words about space, size, or time . . . (ii) cannot |
| 13 | rhyme words or the sounds in words; (iii) has difficulty recalling important things learned in school yesterday; (iv) has difficulty solving mathematics questions or |
| 14 | computing arithmetic answers; or (v) talks only in short, simple sentences, and has difficulty explaining what he means. |
| 15 | The claimaint has less than marked limitation in acquiring and using information. A few "obvious" problems were noted in the first Teacher Questionnaire, and the |
| 16 | claimant qualified for and was in special education, but the more recent Teacher Questionnaire listed generally good comments which were supported by the State agency |
| 17 | evaluation discussed above.  The claimant testified that he has never had to repeat an entire year of school, and his father stated that his son is only in 2 special education |
| 18 | classes. |

AR 15-16, emphasis in original & internal citations omitted.

While the ALJ's findings do not specificcally reference the Wechsler test scores, his findings do expressly reference exhibit "2F, p. 10" - or page 215 of the administrative record - which includes the recommendations of School Psychologist James Russo and School Psychology Intern Karin Kawagoe following testing of Plaintiff, including the Wechsler Individual Achievement Test administered by Frank Capalare "RSP" on November 21, 2005. The ALJ explained that he opted to rely on "the more recent Teacher Questionnaire" and disability evaluation.  Teacher John De La Cerda indicated in November 2007 that Plaintiff had no problem or mild problems in the following areas: completing tasks; listening and remaining attentive; organization; concentration on schoolwork; playing; staying seated and still; thinking

before acting; ability to learn new skills and keep up with peers; and ability to acknowledge mistakes. It was noted Plaintiff did not have any difficulty expressing his thoughts or feelings, and that he was cooperative and polite, could take care of his own needs and did not require special supervision in the classroom. AR 187-193. Dr. Luu completed a childhood disability evaluation form on January 29, 2007, and found less than marked limitations in the four of the six domains, and no limitation with regard the remaining four domains. In the domain of acquiring and using information, Dr. Luu noted "Per TQ 4/10 obvious problems, 6/10 sligh[t] problems" and in the attending and completing tasks domain, Dr. Luu noted "Per TQ. 4/13 obvious problems, 5/13 slight problems, 3/13 no problem." AR 243.

In sum, the ALJ provided an explanation for his findings; he elected to credit the more recent questionnaire and evaluation, coupled with the fact Plaintiff was receiving special education instruction in just two classes rather than all classes, and had not had to repeat a year in school.

***Examining Opinion of Dr. Damania***

Plaintiff contends the ALJ's RFC assessment is contrary to and ignores the medical opinion contained in Dr. Damania's report. He reasons the ALJ failed to properly consider the functional limitations assessed and the ALJ did not offer a legitimate reason for discounting it. More particularly, Dr. Damania limited Plaintiff to lifting and carrying fifty pounds occasionally and twenty-five pounds frequently, yet the ALJ's finding involves no exertional limitation. (Doc. 13 at 11-13.) The Commissioner replies that any error was harmless because Dr. Damania's opinion regarding Plaintiff's functional limitations concerning lifting and carrying would result in a finding that Plaintiff could perform the full range of medium unskilled work. Due to Plaintiff's young age and level of education, a medium unskilled RFC would result in a finding of not disabled. Moreover, application of the Grids would result in the same findings even were Dr. Damania's opinion fully credited. (Doc. 17 at 10-11.)

An ALJ must provide "clear and convincing" reasons for rejecting the uncontroverted opinion of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995) (citations omitted). The opinion of an examining doctor, even if contradicted by another doctor,

19

can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Id.* (*citing Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995)).

The ALJ's RFC found no restriction in the area of daily living, mild difficulty in maintaining social functioning and maintaining concentration, persistence and pace, progressing to moderate difficulties with detailed or complex tasks.

Here however, ALJ Haubner's findings do not "simply ignore" Dr. Damania's opinion as Plaintiff suggests. The ALJ referenced Dr. Damania's opinion when he addressed Plaintiff's severe impairments at pages 13 and 14 of the administrative record: "Exhibit 3F." Further, the ALJ expressly stated "I do not find the consultative examiner's opinion that claimant is limited to medium exertion consistent with the evidence discussed above, *including the examiner's own completely normal physical examination*. That medium limitation is therefore given little weight." AR 13, n. 1, emphasis added. A lack of supporting clinical findings is a valid reason for rejecting a treating physician's opinion. *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Thus, ALJ Haubner provided a specific and legitimate reason for discounting Dr. Damania's opinion regarding Plaintiff's exertional limitations.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Jacobbi J. Wilson.

IT IS SO ORDERED.

Dated: **February 16, 2010**   **/s/ Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE